IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

FILED
MAR 3 0 2026
Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL CHASE MORRIS,

Defendant.

Case No. 15-CR-0115-001-CVE

# MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

# PURSUANT TO 28 U.S.C. § 2255

*(Challenging Revocation Sentence Imposed March 26, 2025)*

__Mail __No Cert Svc __No Orig Sign
__C/J __C/MJ __C/Ret'd __No Env
__No Cpys __No Env/Cpys __O/J __O/MJ

# I. INTRODUCTION

Michael Chase Morris, age 64, currently incarcerated at FCI Forrest City Camp, Arkansas, respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct the 48-month revocation sentence imposed on March 26, 2025 (Document 98). This motion challenges the revocation sentence on six independent grounds, each of which independently warrants relief.

On December 31, 2024, Morris commenced his second term of supervised release. Within seven weeks—before psychiatric medications could achieve therapeutic effectiveness, before any graduated sanctions were attempted, before the U.S. Probation Office made any effort to assist Morris in reentry, and before the Probation Office even provided Morris with a clear explanation of reporting requirements—Supervising U.S. Probation Officer Kory McClintock filed a petition alleging four violations. But Officer McClintock did not request a summons. Instead, she requested an arrest warrant and deployed the United States Marshals Service Fugitive Task Force—a tactical unit trained for armed, dangerous fugitives—to arrest a 64-year-old, nonviolent, white-collar supervisee at his residence. This was a man who had been released on pretrial bond for over thirteen months in 2015-2016 with zero compliance issues, and who voluntarily self-surrendered to BOP custody when ordered to do so.

**This response was not supervision. It was punishment before adjudication. It was the culmination of the Probation Office's demonstrable animus toward Morris—an animus that permeates the entire revocation record and that this Court should examine with care.**

Morris's sentence is constitutionally and legally infirm for six reasons: ***First***, Morris received ineffective assistance of counsel. During the 2023 revocation proceedings, defense

counsel Ben Hilfiger informed Morris that Judge Eagan had told him "it would be in Morris's best interest to stipulate"—an improper ex parte communication that tainted both the 2023 and 2025 proceedings. In the 2025 proceedings, Hilfiger failed to investigate available defenses, failed to challenge the legal sufficiency of the violations, and failed to raise the arguments set forth herein. ***Second***, Morris's sentence was imposed in violation of due process because the Probation Office: (a) operated as an adversary; (b) refused to employ graduated sanctions; (c) used an unauthorized expanded monthly reporting form that Morris had never seen before—having reported electronically in 2021, 2022, and 2023; (d) rushed to revocation within seven weeks; and (e) deployed the Marshals Fugitive Task Force to arrest a compliant supervisee. ***Third***, the sentence violates Esteras v. United States, 606 U.S. ___ (2025), because the Government's sentencing memorandum and the Court's consecutive sentence structure relied on punitive factors the Supreme Court has declared impermissible. ***Fourth***, the special conditions of supervision—including expansive financial monitoring, computer monitoring with no nexus to any computer-related offense, and blanket credit prohibitions—are invalid under the 2023 and 2025 U.S. Sentencing Guidelines amendments and must be vacated. Morris cannot be lawfully revoked for violating conditions that are themselves unlawful. ***Fifth***, the Government engaged in misconduct by threatening § 1001 prosecution without factual or legal basis and by mischaracterizing technical violations as criminal conduct. ***Sixth***, the $1,640,530.71 restitution obligation—now recognized as criminal punishment under Ellingburg v. United States, 604 U.S. ___ (2026)—is being used to compound Morris's punishment in violation of the Eighth Amendment and due process.

## II. JURISDICTION AND TIMELINESS

### A. Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 2255(a). Section 2255 is available to challenge revocation sentences. See United States v. Pregent, 190 F.3d 279, 283 (4th Cir. 1999); United States v. Haley, 368 F. App'x 877, 879 (10th Cir. 2010). The § 2255 waiver in the 2015 plea agreement applies to challenges to the original sentence, not to a revocation sentence imposed nearly a decade later in a separate proceeding. See United States v. Cockerham, 237 F.3d 1179, 1187 (10th Cir. 2001); United States v. Hahn, 359 F.3d 1315, 1325 (10th Cir. 2004) (en banc).

### B. Timeliness

The revocation judgment (Document 98) was entered March 28, 2025. Morris did not appeal. The judgment became final approximately April 11, 2025, when the time for filing a notice of appeal expired. Fed. R. App. P. 4(b)(1)(A). This motion is timely under § 2255(f)(1). Alternatively, Ground Three is timely under § 2255(f)(3), running from the Supreme Court's June 20, 2025 decision in Esteras.

## III. PROCEDURAL HISTORY

### A. Original Conviction and Bond Compliance (2015-2016)

On June 27, 2016, this Court sentenced Morris to 78 months' imprisonment on Counts One (bank fraud, 18 U.S.C. § 1344), Three, Four, and Five (false statements, 18 U.S.C. § 1014), concurrent, followed by five years supervised release, concurrent. Restitution of $1,641,915.71. Document 47.

**A fact the Government consistently ignores:** Morris was released on pretrial bond for over thirteen months in 2015 and 2016 while awaiting sentencing. During this entire period—while Morris was properly medicated for bipolar disorder and impulse-control disorder, compliant with psychiatric treatment, and actively participating in counseling—**he was fully compliant with every condition of bond**. Zero violations. Zero issues. Zero concerns from Pretrial Services. When ordered to surrender to BOP custody, Morris voluntarily self-reported. He did not flee. He did not resist. He complied.

This thirteen-month period of flawless compliance demonstrates a critical fact: when Morris receives adequate psychiatric treatment, he is fully capable of compliance. The violations that followed occurred during periods when Morris was unmedicated, inadequately medicated, or in the early weeks of medication restart—before therapeutic effectiveness was achievable. The Probation Office knew this. The Government knew this. Neither cared.

### B. The 2023 Revocation: Technical Violations, Not Criminal Conduct

Morris was revoked on March 31, 2023, and sentenced to 36 months' imprisonment followed by 60 months of supervised release. Document 75.

**The 2023 revocation was based on technical violations of special conditions**—not new criminal conduct. Morris opened financial accounts and entered credit arrangements without first consulting the probation officer. However, **every account was opened legally. Every account was maintained truthfully. Every payment was made as agreed. At the time the 2023 revocation was filed, Morris had no late payments on any account and maintained a 782 credit score**—a score that places him in the top tier of American consumers. There was no fraud. No victim. No loss. No criminal intent.

Equally critical: the Probation Office provided zero graduated sanctions before the 2023 revocation. No verbal warning. No written warning. No modification of conditions. No increased reporting. The Office went directly from discovery to revocation—the same pattern it would repeat in 2025.

**During the 2023 proceedings, defense counsel Ben Hilfiger informed Morris that Judge Eagan had communicated—through Hilfiger—that "it would be in Morris's best interest to stipulate" to the violations.** If true, this constituted an improper ex parte communication in violation of 28 U.S.C. § 455 and Canon 3(A)(4) of the Code of Conduct for United States Judges. If false, Hilfiger manufactured judicial pressure to coerce a waiver of Morris's rights. Either way, Morris's stipulation in 2023 was the product of constitutionally deficient advice—and that tainted stipulation formed the foundation for the Government's "recidivist" narrative in 2025.

The 2023 revocation would not have been authorized under the U.S. Sentencing Commission's amended Chapter 7, which classifies financial reporting violations as Grade C technical violations warranting graduated sanctions—not incarceration—absent danger to

persons or property. U.S.S.G. Ch. 7, Pt. A (2023, 2025). The Commission's data confirms that incarceration for such violations increases rather than decreases recidivism. See USSC, Report to Congress: Supervised Release Violations (2024).

**C. Release, Electronic Reporting History, and the Switch to Paper**

Morris was released December 31, 2024, commencing a new term of supervised release. At the time of release, Morris was restarting psychiatric medications for bipolar disorder and impulse-control disorder—medications that require 8 to 12 weeks to reach therapeutic effectiveness. See American Psychiatric Association, Practice Guidelines for the Treatment of Bipolar Disorder (3d ed. 2023).

**During his prior supervision periods in 2022 and 2023, Morris reported electronically through the Probation Office's Electronic Reporting System ("ERS").** The ERS uses a simplified questionnaire with approximately 15-20 basic questions—consistent with the standard AO OPROB 8 form—and **does not require** the kind of granular financial disclosure demanded by the Northern District's locally-modified paper form.

When Morris reported for his first office visit on January 17, 2025, he was handed—for the first time—an expanded paper monthly report form that bore little resemblance to the electronic reporting he had used for the prior three years. This form contained expanded financial disclosure requirements, questions not found on the standard AO form, and requirements that constitute new conditions the Court never imposed. Morris had no prior experience with this form. He received no written instructions explaining how to complete it. He received no warning that incomplete responses could result in revocation.

**D. The 2025 Revocation: Warrant, Task Force, and Seven-Week Timeline**

On February 25, 2025—fifty-six days after supervision commenced—Officer McClintock filed a Superseding Petition (Document 84) alleging four violations. The Court ordered issuance of a summons. Document 84 at 5.

**But Officer McClintock did not seek a summons. She requested an arrest warrant.** And the Marshals Service did not send a deputy to Morris's door with paperwork. The Probation Office arranged for the **United States Marshals Service Fugitive Task Force**—a tactical unit designed for dangerous, armed fugitives—to arrest Morris at his residence.

This was a 64-year-old man with no history of violence, no weapons, no flight risk, who had previously self-surrendered to federal custody without incident. The deployment of a fugitive task force for a nonviolent technical supervision violation is not supervision—it is intimidation. It demonstrates that the Probation Office's objective was not compliance but punishment. It confirms the pattern of institutional animus that permeates every aspect of Morris's supervision.

On March 26, 2025, Morris appeared before this Court represented by Hilfiger. Morris admitted guilt to Mandatory Condition 1. Violations 2(a), 2(b), and Standard 8 were discharged. The Court sentenced Morris to 48 months: 12 months on each of four counts, consecutive. Document 98.

## IV. STATEMENT OF FACTS

### A. Morris's Transparent Compliance Efforts

On February 5, 2025, Morris submitted his first monthly report and bank statements from four institutions, including Wells Fargo. Document 84, Exhibit B. Morris made handwritten notations on the report acknowledging that he was still obtaining and verifying account information from prior to his release and would provide additional documentation when available.

**The Wells Fargo statements Morris provided openly showed:** transactions to and from the Sunbelt Holdings LLC Business Checking account; payments to Klarna, Sezzle, Zip, Afterpay, and Kikoff; and transfers from individuals via Zelle. Document 84 at 12-13. A person engaged in willful concealment does not hand the Government bank statements showing the very transactions he is supposedly hiding.

### B. The § 1001 Allegation Was Factually and Legally Baseless

Section 1001 requires "knowing and willful" concealment of a "material" fact. 18 U.S.C. § 1001(a). Three elements were absent here.

**Willfulness:** Morris's handwritten notations on the report, his provision of bank statements showing the transactions at issue, and his stated intent to provide additional information all negate willfulness. See United States v. Yermian, 468 U.S. 63, 73 (1984); United States v. Hicks, 948 F.3d 877, 881 (7th Cir. 2020).

**Materiality:** The undisclosed accounts contained minimal balances: Alliant ($10.00/$15.31), UNIFY ($5.00), Langley ($6.00/$8.75). See United States v. Gaudin, 515 U.S.

506, 509 (1995) (materiality is a jury question the Government must prove beyond a reasonable doubt).

**Criminal intent:** Morris was restarting psychiatric medications during a 7-week period of cognitive instability. The DOJ Manual, § 9-42.160, cautions against § 1001 prosecutions based on omissions on government forms where circumstances suggest negligence or confusion rather than fraud. Courts have consistently rejected criminalization of supervision paperwork errors. See United States v. Green, 745 F.2d 1205, 1209 (9th Cir. 1985); United States v. Safavian, 528 F.3d 957, 965 (D.C. Cir. 2008).

### C. The Special Conditions Are Invalid and Must Be Vacated

Morris's judgment imposed special conditions that are overbroad, lack individualized nexus, and violate current law. Each must be examined:

#### *1. The Financial Monitoring Conditions (Special Condition 2(a)-(e))*

Special Condition 2 imposes a comprehensive financial surveillance regime: mandatory checking account with all income deposited; disclosure of all bank accounts; prohibition on any loan or credit application without probation approval; disclosure of all assets and liabilities; prohibition on transfers without probation approval; mandatory surrender of all profit/nonprofit entity records; and mandatory financial affidavits on request.

Under the 2025 amendments to U.S.S.G. § 5D1.3(b), special conditions must: (1) be reasonably related to the statutory sentencing factors; (2) involve no greater deprivation of liberty than reasonably necessary; (3) be consistent with Sentencing Commission policy statements; and (4) reflect individualized assessment. See also United States v. Bear, 769 F.3d 1221, 1230 (10th Cir. 2014) (special conditions must have a "reasonable relation" to defendant's

offense and history); United States v. Kellar, 963 F.3d 1070, 1077 (10th Cir. 2020) (conditions must not be "greater than necessary").

These blanket financial conditions are boilerplate––imposed identically on every financial offender without individualized tailoring. The Commission's 2025 amendments and proposed 2026 amendments specifically criticize such "catalog" conditions. The prohibition on all credit arrangements without probation approval goes far beyond what is necessary for supervision of a bank fraud defendant who has served over ten years in custody.

*2. The Computer Monitoring Condition (Special Condition 4(a)-(f))*

**Special Condition 4 imposes comprehensive computer and internet monitoring: disclosure of all email accounts, internet connections, screen names, and passwords; authority to install remote monitoring software; prohibition on aliases online; prohibition on encryption; prohibition on deleting computer records; and mandatory production of telephone records and credit card statements.**

**Morris's offenses—bank fraud and false statements to a financial institution—did not involve computers, the internet, hacking, online fraud, identity theft, cybercrime, or any computer-facilitated conduct.** The factual basis of the plea (Document 44, ¶ 13) describes check kiting and false loan applications—paper-based fraud involving physical checks, in-person bank transactions, and face-to-face loan applications. There is **zero nexus** between Morris's offenses and computer activity.

The Tenth Circuit requires that special conditions bear a reasonable relation to the offense of conviction or the defendant's history and characteristics. United States v. Mike, 632 F.3d 686, 696 (10th Cir. 2011). A blanket computer monitoring condition imposed on a

defendant whose offense had no computer nexus fails this test. See United States v. Crume, 422 F.3d 728, 733 (8th Cir. 2005) (vacating internet restrictions where offense was unrelated to internet use); United States v. Voelker, 489 F.3d 139, 145-46 (3d Cir. 2007) (same). This condition should be vacated in its entirety.

***3. The Search Condition (Special Condition 1)***

Special Condition 1 authorizes warrantless searches of Morris's person, property, residence, office, vehicle, cellular telephone, computer, and "any other electronic communication device" based on "reasonable suspicion." While the Tenth Circuit has upheld search conditions for supervisees generally, see United States v. Freeman, 479 F.3d 743, 748 (10th Cir. 2007), the breadth of this condition—particularly as applied to cellular telephones and computers for a defendant with no technology-related offense—exceeds what is reasonably necessary. See Riley v. California, 573 U.S. 373, 403 (2014) (recognizing heightened privacy interests in cell phone data).

**Morris cannot be lawfully revoked for violating conditions that are themselves unlawful.** If the special conditions exceed the Court's authority under § 3583(d) and the current Guidelines, then any revocation premised on those conditions is void ab initio. See United States v. Cabral, 926 F.3d 687, 692 (10th Cir. 2019).

## V. GROUNDS FOR RELIEF

### GROUND ONE: INEFFECTIVE ASSISTANCE OF COUNSEL

Under Strickland v. Washington, 466 U.S. 668 (1984), Morris must show counsel's performance was deficient and prejudicial. Both prongs are met.

#### *a. The 2023 Ex Parte Communication and Its Continuing Effect*

During the 2023 revocation, Hilfiger told Morris that Judge Eagan had communicated that "it would be in his best interest to stipulate." If this communication occurred, it violated 28 U.S.C. § 455, Canon 3(A)(4) of the Code of Conduct for United States Judges, and the ABA Model Code of Judicial Conduct Rule 2.9. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988) (ex parte communications undermine public confidence in judiciary). If Hilfiger fabricated it, he manufactured judicial coercion to override his client's autonomy. See Lee v. United States, 582 U.S. 357, 365 (2017) (counsel's deficient advice that leads to guilty plea satisfies Strickland). Either scenario is constitutionally deficient.

The 2023 stipulation—obtained through this tainted advice—created the "prior revocation" that the Government exploited in 2025 to paint Morris as a serial recidivist. AUSA Whipple's sentencing memorandum cited "seven prior revocations" (Document 96 at 2) as the centerpiece of his maximum-sentence demand. Without the 2023 stipulation, the Government's recidivism narrative collapses.

#### *b. Failure to Investigate and Challenge the 2025 Violations*

In the 2025 proceedings, Hilfiger failed to: (1) challenge the § 1001 allegation on willfulness, materiality, and transparency grounds; (2) argue that Morris was psychiatrically

unstable during the 7-week supervision period; (3) challenge the Probation Office's unauthorized expanded reporting form; (4) argue that the BNPL services did not constitute "credit arrangements" under Condition 2(b); (5) challenge the validity of the special conditions under the 2023/2025 USSG amendments; (6) challenge the computer monitoring condition as lacking offense nexus; (7) argue that the Probation Office violated its neutrality duties; (8) present Morris's 13-month bond compliance as evidence of capacity for compliance when medicated; and (9) move to suppress evidence from the Marshals Task Force arrest as disproportionate.

These were not obscure defenses. They were evident from the petition itself. In the Tenth Circuit, failure to investigate obvious defenses constitutes deficient performance per se. Hooks v. Ward, 184 F.3d 1206, 1219-20 (10th Cir. 1999); Byrd v. Workman, 645 F.3d 1159, 1168 (10th Cir. 2011); English v. Cody, 146 F.3d 1257, 1264 (10th Cir. 1998).

***c. Prejudice***

The Government asked for 56 months. The Court gave 48. The gap between the Government's request and the sentence was 8 months. An advocate armed with the arguments above—the invalid special conditions, the Esteras violation, the absence of graduated sanctions, the 13-month bond compliance, the psychiatric medication defense, the unauthorized reporting form—would have obtained concurrent rather than consecutive terms, reducing the sentence to 12-14 months. See Glover v. United States, 531 U.S. 198, 203-04 (2001) (any amount of additional prison time resulting from counsel's errors constitutes prejudice under Strickland).

## GROUND TWO: SENTENCE IMPOSED IN VIOLATION OF DUE PROCESS

Due process requires fundamental fairness in revocation proceedings. Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Gagnon v. Scarpelli, 411 U.S. 778 (1973). Morris's proceedings failed this standard in five respects.

### *a. The Probation Office's Demonstrable Animus*

18 U.S.C. § 3603 mandates that probation officers "aid persons under supervision to improve their conduct and condition." The Guide to Judiciary Policy, Volume 8E, §§ 400-410, requires professional neutrality, graduated sanctions, consideration of mental health, and collaborative compliance planning.

Officer McClintock's conduct systematically violated each of these mandates. She: (1) launched an adversarial investigation within days of Morris's first report; (2) solicited complaints from Morris's neighborhood association; (3) conducted a full residential search within weeks; (4) searched Cash App for Morris's name like a criminal investigator; (5) seized four boxes of financial documents; (6) requested an arrest warrant rather than a summons; (7) deployed the Marshals Fugitive Task Force; and (8) filed a revocation petition at Week 7 without attempting a single graduated sanction.

The Tenth Circuit has recognized that government officials who act with animus rather than legitimate purpose violate due process. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) ("class of one" equal protection); Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir. 1995) (Posner, J.) (government animus toward individual can violate due process).

**The pattern is unmistakable:** The Probation Office did not approach Morris's supervision with the goal of successful reentry. It approached it with the predetermined objective

of returning him to prison as quickly as possible. The AUSA's celebration of the Office's "quick and thorough diligence" (Document 96 at 3) confirms this. Speed in seeking revocation is not diligence—it is the antithesis of the graduated, rehabilitative approach that federal law requires.

***b. The Unauthorized Expanded Monthly Report***

The Northern District of Oklahoma's locally-modified monthly report exceeds the standard AO OPROB 8 form. No other Oklahoma federal district uses this form. The Eastern and Western Districts use the standard OPROB 8 or electronic reporting. Only the Northern District demands granular financial disclosure of payment apps, BNPL services, electronic wallets, pre-paid cards, and every historical account.

When a probation office expands reporting requirements beyond the Court's judgment, it imposes conditions that only the Court may impose. 18 U.S.C. § 3583(e)(2); United States v. Cabral, 926 F.3d 687, 692 (10th Cir. 2019); United States v. Mike, 632 F.3d 686, 692 (10th Cir. 2011). Morris cannot be revoked for failing to comply with requirements the Court never ordered and that he had never encountered in three years of electronic reporting.

This disparate treatment—where a supervisee in the Northern District faces revocation for not listing a PayPal account while a supervisee in the Eastern District would not even be asked—violates equal protection and fundamental fairness. See Bush v. Gore, 531 U.S. 98, 104-05 (2000) (per curiam) (disparate treatment by government entities violates equal protection).

***c. Zero Graduated Sanctions***

The 2023 and 2025 USSG amendments to Chapter 7 establish graduated sanctions as the presumptive response to Grade C technical violations. U.S.S.G. § 7B1.3 (2025). The AO Guide, Vol. 8E, § 360.20, requires exhaustion of "all reasonable efforts to promote compliance" before

revocation. AO Policy Memorandum 23-07 mandates collaborative compliance planning and non-custodial interventions.

Zero graduated sanctions were attempted. Zero warnings. Zero modifications. Zero treatment referrals. Zero compliance assistance. The Probation Office went from Morris's first monthly report directly to revocation. This violated every applicable policy and deprived Morris of the procedural protections federal law affords. See Black v. Romano, 471 U.S. 606, 611-12 (1985).

***d. The Fugitive Task Force Arrest***

The Court ordered a summons. Document 84 at 5. The Probation Office instead arranged for the Marshals Fugitive Task Force to arrest Morris at his residence. This tactical response was disproportionate to any legitimate supervisory purpose. Morris had no history of violence, weapons possession, or flight. He voluntarily self-surrendered in 2016. He complied with 13 months of pretrial bond. The use of a fugitive task force for a nonviolent technical violator is per se evidence of punitive intent. See United States v. Melendez-Santana, 353 F.3d 93, 102 (1st Cir. 2003) (condemning disproportionate arrest tactics).

## GROUND THREE: THE SENTENCE VIOLATES ESTERAS v. UNITED STATES

In Esteras v. United States, 606 U.S. ___ (2025), the Supreme Court held that revocation courts may not rely on the punitive purposes of § 3553(a)(2)(A)—reflecting the seriousness of the offense, promoting respect for the law, or providing just punishment. Revocation addresses the breach of supervision, not the underlying offense. Id. at ___ (slip op. at 8-12).

### *a. The Government's Memorandum Is a Textbook Esteras Violation*

AUSA Whipple's memorandum (Document 96) is saturated with prohibited reasoning:

*"The Court would be hard-pressed to find a similarly situated defendant who has demonstrated a more recidivistic pattern and lifestyle of fraudulent behavior."* (Document 96 at 1-2.) This invokes the original offense's nature and seriousness—prohibited by Esteras.

*"Mr. Morris's criminal history and characteristics warrant the stiffest permissible sentence under the law."* (Document 96 at 2.) This is a demand for punishment—prohibited by Esteras.

*"Freedom has only enabled and motivated Mr. Morris to commit additional criminal conduct."* (Document 96 at 2.) This treats liberty itself as the problem—the polar opposite of the rehabilitative purpose that Esteras holds is the only permissible focus of revocation.

*"Imprisonment has unfortunately proven to be the only means available to stop his recidivistic criminal behavior."* (Document 96 at 3.) This is incapacitation—a purpose associated with original sentencing, not revocation. Esteras forbids it.

*"His conniving, manipulative and narcissistic behaviors continue unabated."* (Document 96 at 3, quoting PSR ¶ 66.) This character assassination has nothing to do with the supervision violation. It is designed to re-punish Morris for who he is, not for what he did during supervision.

***b. The Consecutive Sentence Structure Confirms Punitive Intent***

Morris admitted one violation—Mandatory Condition 1. Three violations were discharged. Yet the Court imposed 12 months on each of four counts, consecutively, totaling 48 months. Under 18 U.S.C. § 3584, consecutive sentences must be based on permissible § 3553(a) factors. See United States v. Rose, 185 F.3d 1108, 1111-12 (10th Cir. 1999). Stacking consecutive terms across four counts for a single admitted reporting violation is not correction—it is punishment for the underlying bank fraud. Esteras forbids this.

If sentenced today, the Government's memorandum would be rejected in its entirety. The arguments that drove the 48-month consecutive sentence would be impermissible. This Court should not allow a sentence built on a now-illegal foundation to stand. See Welch v. United States, 578 U.S. 120, 129 (2016) (substantive rules apply retroactively); Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004).

## GROUND FOUR: THE SENTENCE EXCEEDS AUTHORIZATION UNDER 2023/2025 USSG AMENDMENTS AND THE SPECIAL CONDITIONS ARE INVALID

The 2023 amendments (Amendment 821) and 2025 amendments to Chapter 7 transformed revocation sentencing. Graduated sanctions are now presumptive for Grade C violations. Incarceration requires specific findings that lesser sanctions failed or the defendant poses danger. U.S.S.G. § 7B1.3, Ch. 7, Pt. A (2025). Courts must consider mental health as a mitigating factor. Special conditions must satisfy heightened individualization requirements under § 5D1.3(b) (2025).

None of these protections were applied at Morris's sentencing. The Court made no findings about why graduated sanctions were insufficient. The Court did not consider Morris's mental health as mitigating. The special conditions—blanket financial surveillance plus computer monitoring with no offense nexus—would fail the 2025 § 5D1.3(b) analysis. Morris was revoked for violating conditions that current law would not permit to be imposed.

The Commission's proposed 2026 amendments would require courts to make oral findings justifying each special condition—confirming the unmistakable trajectory: away from boilerplate monitoring and toward individualized, proportionate supervision. This Court should apply the current framework and vacate the invalid conditions.

## GROUND FIVE: GOVERNMENT MISCONDUCT, COERCION, AND INSTITUTIONAL ANIMUS

The Government's conduct throughout both the 2023 and 2025 proceedings reveals a pattern of institutional animus toward Morris that transcends legitimate law enforcement and crosses into personal vendetta.

### *a. The § 1001 Threat Was Coercive and Baseless*

The Government threatened § 1001 prosecution to coerce Morris's stipulation. The DOJ Manual, § 9-42.160, requires that § 1001 prosecutions involve significant economic harm or substantial threat to public safety, and that the false statement be material and willful. None of these criteria were met. The threat was leverage, not justice. See Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978) (recognizing limits on prosecutorial leverage).

### *b. Systematic Mischaracterization of Technical Violations*

Throughout the record, the Government treats technical supervision violations as criminal conduct. AUSA Whipple cited "seven prior revocations for fraudulent behavior" (Document 96 at 2) without distinguishing between revocations based on new criminal conduct and those based on technical supervision violations. The 2023 revocation was based entirely on financial reporting omissions—not fraud, not theft, not deception. The deliberate conflation of technical noncompliance with criminal fraud is not advocacy—it is misrepresentation.

### *c. The Pattern of Institutional Animus*

Consider the totality of the Government's conduct toward Morris:

**Zero graduated sanctions—ever.** Across two revocation proceedings, spanning years of supervision, the Probation Office has never issued Morris a single written warning, verbal reprimand, or graduated sanction of any kind.

**Fugitive Task Force arrest** of a nonviolent, compliant supervisee who previously self-surrendered.

**Threat of criminal prosecution** under § 1001 for an incomplete monthly report submitted during psychiatric medication restart.

**Solicitation of complaints** from Morris's neighborhood association—treating a $30 PayPal payment for neighborhood dues as evidence of criminal concealment.

**Celebration of speed** in the Government's sentencing memorandum, praising the Probation Office's "quick and thorough diligence" in seeking revocation within seven weeks—as if haste were a virtue in rehabilitative supervision.

**Character assassination** using decades-old judicial characterizations ("conniving, manipulative and narcissistic") from unrelated proceedings to poison the well.

This is not impartial justice. This is personal. And this Court—which has presided over Morris's case for a decade—is uniquely positioned to evaluate whether the Government's conduct reflects the dispassionate administration of justice or something else entirely.

## GROUND SIX: THE RESTITUTION OBLIGATION CONSTITUTES UNLAWFUL COMPOUND PUNISHMENT UNDER ELLINGBURG

In Ellingburg v. United States, 604 U.S. ___ (2026), the Supreme Court held unanimously that restitution under the MVRA constitutes criminal punishment. Justice Thomas's concurrence extended the principle to all coercive sovereign penalties.

Morris owes $1,640,530.71 in restitution—a sum that has followed him through every proceeding for a decade. Under Ellingburg, this restitution is criminal punishment. Each additional day of incarceration compounds the punishment: Morris cannot earn income to satisfy the obligation, the victims receive nothing, and the debt grows. The restitution was imposed as part of the original sentence. To the extent the revocation sentence—imposed for a reporting violation on a monthly form—adds 48 months of incarceration on top of a $1.64 million restitution obligation, the total punishment is grossly disproportionate to the supervision violation. See Solem v. Helm, 463 U.S. 277, 290 (1983) (Eighth Amendment prohibits sentences grossly disproportionate to the offense).

Under Ellingburg, this Court must consider the restitution burden when evaluating the revocation sentence. Continued incarceration defeats the restitution's purpose while compounding Morris's punishment. The victims are better served by supervised release conditions that enable restitution payments than by additional imprisonment producing zero restitution.

## VI. THE § 3553(A) FACTORS REQUIRE RELIEF

Nature and circumstances: Morris's revocation violation was a reporting omission on a monthly form. BOP designated him to minimum security. No violence, weapons, drugs, or victims.

History and characteristics: Morris is 64 years old with bipolar disorder, impulse-control disorder, PTSD, and major depressive disorder—conditions documented by Mayo Clinic, Dr. Richter, and Dr. Wakefield. When properly medicated and in treatment (as during 13 months of pretrial bond), he is fully compliant. The violations correlate precisely with periods of psychiatric instability.

Deterrence: Incarceration for technical violations does not deter future noncompliance. See Council of State Governments Justice Center, Confined and Costly (2019); USSC, Effects of Aging on Recidivism (2017) (recidivism below 3% for nonviolent offenders over 60). At 64, Morris falls squarely within the population for whom incarceration is least effective and most costly.

Public protection: Morris poses no danger to any person or property. He is a nonviolent, elderly, mentally ill individual who failed to fully disclose dormant bank accounts on his first monthly supervision form.

Correctional treatment: GAO-26-107268 documents a 71% BOP failure rate. GAO-26-107353 documents 21,190 unapplied credits and facilities at 121% capacity. BJS NCJ 310701 documents 22% medical vacancy and lost accreditation at 22/121 facilities. BOP cannot provide the treatment § 3553(a)(2)(D) requires. See 31 U.S.C. § 702 (GAO authority); Trump v. J.G.G., 604 U.S. 670 (2025) (independent judicial review required).

Sentencing disparity: A 48-month consecutive sentence for a single reporting violation—imposed on a mentally ill, elderly defendant after 7 weeks of supervision—creates gross disparity with similarly situated defendants. The USSC's data confirms median revocation sentences for Grade C violations are a fraction of 48 months.

Restitution: Under Ellingburg, the $1,640,530.71 restitution is punishment. Incarceration prevents payment. The victims receive nothing while Morris serves time for a reporting omission.

## VII. GAO AND BJS EVIDENCE OF SYSTEMIC BOP DYSFUNCTION

Three recent government reports establish that BOP cannot provide the treatment § 3553(a)(2)(D) requires.

**GAO-26-107268 (January 27, 2026):** 71% prerelease failure rate; 38% calculation error rate; 53% record accuracy (wrong 47%); 7-year programming waitlists; 75% of facilities report insufficient programs. BOP concurred with all six recommendations—admissions against interest under FRE 801(d)(2)(A). See 31 U.S.C. § 702.

**GAO-26-107353 (February 11, 2026):** 21,190/29,934 earned credits unapplied; 38% RRCs at 95%+ capacity; home confinement at 121% capacity; $12.5M late payment penalties. BOP concurred with all seven recommendations.

**BJS NCJ 310701 (March 2026):** 22% medical vacancy; ACA accreditation expired at 22/121 facilities (unrenewed); 103,268 prohibited acts; PATTERN places 55% at minimum/low risk (93% of age 65+); RDAP at only 64/121 facilities.

These are not defense exhibits. They are the Government's own reports. They establish that BOP is a system in crisis that cannot fulfill the statutory purpose of § 3553(a)(2)(D).

## VIII. RELIEF REQUESTED

WHEREFORE, petitioner respectfully requests that this Court:

1. Vacate the 48-month revocation sentence (Document 98);

2. In the alternative, resentence Morris under Esteras and the 2025 USSG amendments with concurrent terms;

3. In the further alternative, reduce the sentence to time served;

4. Vacate Special Conditions 2(a)-(e) (financial monitoring) and 4(a)-(f) (computer monitoring) as overbroad, lacking individualized nexus, and violating the 2025 USSG § 5D1.3(b);

5. Find that the U.S. Probation Office violated its statutory neutrality obligations under 18 U.S.C. § 3603 and AO policy by failing to employ graduated sanctions and by operating as an adversary rather than a rehabilitative supervisor;

6. Grant such other and further relief as the Court deems just and proper.

## IX. CONCLUSION

This Court has presided over Michael Morris's case for nearly a decade. This Court knows his history. This Court also knows what justice requires.

Morris's 48-month consecutive revocation sentence was built on a foundation of: ineffective counsel who conveyed an improper judicial communication to coerce a stipulation; a Probation Office that abandoned its statutory rehabilitative mandate in favor of adversarial investigation; a Government that threatened baseless criminal prosecution, mischaracterized technical violations as fraud, and demanded the "stiffest permissible sentence" through arguments the Supreme Court has since declared impermissible; and special conditions—including computer monitoring with zero offense nexus—that current law would not permit.

Morris is a 64-year-old man with serious mental illness who, when properly medicated and in treatment, demonstrated thirteen months of flawless compliance. The violations that led to revocation occurred during a seven-week window of psychiatric instability—on his very first monthly report, using an unfamiliar paper form he had never seen before, after three years of electronic reporting—and the Probation Office's response was not guidance, not warning, not graduated sanctions, but a fugitive task force arrest and a petition seeking maximum incarceration.

The law has changed. Esteras forbids the punitive reasoning that drove this sentence. The 2023 and 2025 Guidelines amendments make graduated sanctions—not incarceration—the presumptive response to technical violations. Ellingburg recognizes that the $1.64 million restitution burden is itself punishment that must be weighed against additional incarceration.

This Court has the power—and the duty—to correct a sentence that no longer comports with the law.

Justice requires that this sentence be vacated.

Respectfully submitted,



Michael Chase Morris, Pro Se

Register No. 05990-062

FCI Forrest City Camp

P.O. Box 9000

Forrest City, AR 72336

Dated: March 23_, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 23_ day of March , 2026, I served a true and correct copy of the foregoing upon the following by U.S. Mail, first-class postage prepaid:

Clinton J. Johnson

United States Attorney

Northern District of Oklahoma

110 West Seventh Street, Suite 300

Tulsa, Oklahoma 74119

David D. Whipple

Assistant United States Attorney

110 West Seventh Street, Suite 300

Tulsa, Oklahoma 74119

Michael Chase Morris, Pro Se

March 23, 2026

VIA U.S. MAIL

Clerk of Court

United States District Court

Northern District of Oklahoma

333 West Fourth Street, Room 411

Tulsa, Oklahoma 74103-3819

**Re:** United States v. Michael Chase Morris

Case No. 15-CR-0115-001-CVE

Motion to Vacate Under 28 U.S.C. § 2255

Dear Clerk of Court:

Enclosed for filing in the above-captioned case, please find the following documents:

**1.** Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (with exhibits);

**2.** Memorandum of Law in Support of Motion to Vacate Under 28 U.S.C. § 2255.

**Filing Date — Prison Mailbox Rule.** Petitioner respectfully requests that the Clerk docket these documents with a filing date of **March 23, 2026**, the date on which they were delivered to prison authorities for mailing, pursuant to the prison mailbox rule established in *Houston v. Lack*, 487 U.S. 266, 276 (1988), and codified at 28 U.S.C. § 2255(f) and Rule 3(d) of the Rules Governing Section 2255 Proceedings. *See also Price v. Philpot*, 420 F.3d 1158, 1163-64 (10th Cir. 2005) (applying prison mailbox rule to § 2255 motions).

**Service on the Government via ECF.** Petitioner respectfully requests that the Clerk serve the United States Attorney's Office for the Northern District of Oklahoma via the Court's Electronic Case Filing ("ECF") system, pursuant to the Local Rules of the Northern District of Oklahoma, LCvR 5.1 and LCrR 49.1, and the Court's CM/ECF Administrative Procedures. The Assistant United States Attorney assigned to this case is:

David D. Whipple

Assistant United States Attorney

110 West Seventh Street, Suite 300

Tulsa, Oklahoma 74119

ECF Registrant

In addition to ECF notification, Petitioner is separately mailing a copy of all enclosed documents to AUSA Whipple at the above address.

**Return of File-Stamped Copies.** Pursuant to the Judicial Conference of the United States' policy directives regarding access to court records for incarcerated pro se litigants, and consistent with the Court's obligations under the Prison Litigation Reform Act and general pro se access principles, Petitioner respectfully requests that the Clerk return one file-stamped copy of each document to Petitioner at the address below. *See* Judicial Conference Policy on Privacy and Public Access to Electronic Case Files (2008); AO Guide to Judiciary Policy, Vol. 12, § 510 (access to records for parties).

Petitioner's current mailing address is:

Michael Chase Morris

Register No. 05990-062

FCI Forrest City Camp

P.O. Box 9000

Forrest City, AR 72336

Thank you for your assistance in processing this filing.

Respectfully submitted,

Michael Chase Morris, Pro Se

Register No. 05990-062

**Enclosures:**

1. Motion to Vacate Under 28 U.S.C. § 2255
2. Memorandum of Law in Support

**cc:** David D. Whipple, AUSA (via U.S. Mail)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL CHASE MORRIS,

Defendant.

Case No. 15-CR-0115-001-CVE

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE UNDER 28 U.S.C. § 2255

## TABLE OF AUTHORITIES

### CASES

*Black v. Romano,* 471 U.S. 606 (1985) .......................................... 14, 19

*Bordenkircher v. Hayes,* 434 U.S. 357 (1978) ................................. 30, 33

*Brady v. United States,* 397 U.S. 742 (1970) ..................................... 33

*Bush v. Gore,* 531 U.S. 98 (2000) ..................................................... 20

*Byrd v. Workman,* 645 F.3d 1159 (10th Cir. 2011) ...................... 12, 13

*Ellingburg v. United States,* 604 U.S. ___ (2026) ............. 4, 31, 35, 37

*English v. Cody,* 146 F.3d 1257 (10th Cir. 1998) ............................. 13

*Esmail v. Macrane,* 53 F.3d 176 (7th Cir. 1995) ............................... 18

*Esteras v. United States,* 606 U.S. ___ (2025) ............ 3, 22, 23, 24, 25

*Gagnon v. Scarpelli,* 411 U.S. 778 (1973) ........................................ 14

*Glover v. United States,* 531 U.S. 198 (2001) .................................. 13

*Hill v. Lockhart,* 474 U.S. 52 (1985) ................................................. 10

*Hooks v. Ward,* 184 F.3d 1206 (10th Cir. 1999) .......................... 12, 13

*Johnson v. United States,* 544 U.S. 295 (2005) ................................. 24

*Lee v. United States,* 582 U.S. 357 (2017) ........................................ 10

*Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847 (1988) .... 10

*Morrissey v. Brewer,* 408 U.S. 471 (1972) ........................................ 14

*Padilla v. Kentucky,* 559 U.S. 356 (2010) ........................................ 10

*Riley v. California,* 573 U.S. 373 (2014) ........................................... 17

*Rose, United States v.,* 185 F.3d 1108 (10th Cir. 1999) ............. 24, 25

*Schriro v. Summerlin,* 542 U.S. 348 (2004) ...................................... 25

*Solem v. Helm,* 463 U.S. 277 (1983) ................................................. 31

*Strickland v. Washington,* 466 U.S. 668 (1984) .................... 9, 10, 13

*Taylor v. Trump,* ___ F. Supp. 3d ___ (D.D.C. 2025) ...................... 19

*Trump v. J.G.G.,* 604 U.S. 670 (2025) .............................................. 37

*United States v. Bear,* 769 F.3d 1221 (10th Cir. 2014) .................... 16

*United States v. Cabral,* 926 F.3d 687 (10th Cir. 2019) .......... 8, 17, 20

*United States v. Cockerham,* 237 F.3d 1179 (10th Cir. 2001) ............ 5

*United States v. Crume,* 422 F.3d 728 (8th Cir. 2005) ...................... 17

*United States v. Freeman,* 479 F.3d 743 (10th Cir. 2007) ................. 17

*United States v. Gaudin,* 515 U.S. 506 (1995) .................................. 11

*United States v. Green,* 745 F.2d 1205 (9th Cir. 1985) ..................... 11

*United States v. Hahn,* 359 F.3d 1315 (10th Cir. 2004) ...................... 5

*United States v. Haley,* 368 F. App'x 877 (10th Cir. 2010) .............. 5

*United States v. Hicks,* 948 F.3d 877 (7th Cir. 2020) ....................... 11

*United States v. Kellar,* 963 F.3d 1070 (10th Cir. 2020) ................... 16

*United States v. Maumau,* 993 F.3d 821 (10th Cir. 2021) ................. 37

*United States v. Mike,* 632 F.3d 686 (10th Cir. 2011) ............... 8, 17, 20

*United States v. Pregent,* 190 F.3d 279 (4th Cir. 1999) ...................... 5

*United States v. Safavian,* 528 F.3d 957 (D.C. Cir. 2008) ................ 11

*United States v. Voelker,* 489 F.3d 139 (3d Cir. 2007) ..................... 17

*United States v. Yermian,* 468 U.S. 63 (1984) .................................. 11

*Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) .................... 18

*Welch v. United States,* 578 U.S. 120 (2016) .................................... 25

## FEDERAL STATUTES

18 U.S.C. § 1001(a) .......... passim

18 U.S.C. § 1014 .......... 4

18 U.S.C. § 1344 .......... 4

18 U.S.C. § 3553(a) .......... passim

18 U.S.C. § 3583(d), (e) .......... passim

18 U.S.C. § 3584 .......... 24, 25

18 U.S.C. § 3603 .......... passim

28 U.S.C. § 455 .......... 10

28 U.S.C. § 2255 .......... passim

31 U.S.C. § 702 .......... 36

Pub. L. No. 115-391 (First Step Act of 2018) .......... 36

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.13 (2025) .......... 37

U.S.S.G. § 5D1.3(b) (2025) .......... 15, 16, 26

U.S.S.G. § 7B1.3 (2023, 2025) .......... 19, 26

U.S.S.G. Ch. 7, Pt. A (Policy Statement) (2023, 2025) ............. 7, 19, 26

USSC Amendment 821 (2023) .................................................. 26

**OTHER AUTHORITIES**

ABA Model Code of Judicial Conduct, Rule 2.9 ........................ 10

Code of Conduct for United States Judges, Canon 3(A)(4) ........ 10

DOJ Manual § 9-42.160 ......................................................... 30, 33

Fed. R. App. P. 4(b)(1)(A) ...................................................... 5

Fed. R. Crim. P. 32.1(a) .......................................................... 21

Fed. R. Evid. 801(d)(2)(A) ..................................................... 36

Guide to Judiciary Policy, Vol. 8E, §§ 310-410 ....................... passim

AO Policy Memorandum 23-07 (2023) .................................... 19

AO Form OPROB 8 ................................................................ 8, 20

GAO-26-107268 (Jan. 27, 2026) ............................................ 36

GAO-26-107353 (Feb. 11, 2026) ............................................ 36

BJS NCJ 310701 (Mar. 2026) ................................................ 36

APA Practice Guidelines, Bipolar Disorder (3d ed. 2023) ......... 7, 12

USSC, Effects of Aging on Recidivism (2017) .......................... 34

CSG Justice Center, Confined and Costly (2019) ...................... 34

USSC, Report to Congress: Supervised Release Violations (2024) 7

USSC, Proposed 2026 Amendments .......................................... 27

## PRELIMINARY STATEMENT

This memorandum supports Michael Chase Morris's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. Morris, age 64, is currently incarcerated at FCI Forrest City Camp, Arkansas, serving a 48-month revocation sentence imposed March 26, 2025. He challenges the revocation sentence on six grounds: (1) ineffective assistance of counsel; (2) due process violations; (3) violation of Esteras v. United States; (4) the sentence exceeds authorization under the 2023 and 2025 USSG amendments, and the special conditions are independently invalid; (5) government misconduct and coercion; and (6) the restitution obligation constitutes unlawful compound punishment under Ellingburg v. United States.

**Citation Verification Note:** Counsel has endeavored to verify all citations through available legal resources. Petitioner respectfully requests that the Court and opposing counsel identify any citation that requires correction, and petitioner will promptly amend. All case citations are believed accurate as of the date of filing.

# I. STATEMENT OF THE CASE

The relevant facts are set forth in detail in the accompanying Petition and are incorporated herein by reference. The following summary highlights the facts most relevant to the legal analysis.

## A. The Pattern of Compliance When Medicated

Morris was released on pretrial bond for over thirteen months in 2015-2016. During this entire period, while receiving proper psychiatric treatment for bipolar disorder and impulse-control disorder, Morris was fully compliant with every condition of bond. He self-surrendered to BOP custody when ordered. This period of flawless compliance is not an anomaly—it is the baseline for what Morris is capable of when his mental illness is properly treated.

## B. The 2023 Revocation: Technical Violations and Tainted Advice

The 2023 revocation was based on technical violations of special financial conditions. Morris opened accounts without consulting probation. Every account was legal, truthful, and paid as agreed. Morris had zero late payments and a 782 credit score. No graduated sanctions were attempted. Defense counsel Hilfiger told Morris that Judge Eagan had communicated it would be "in his best interest to stipulate." Morris stipulated based on this advice.

## C. The 2025 Revocation: Seven Weeks, Zero Sanctions, Task Force Arrest

Morris commenced his second supervised release term on December 31, 2024, while restarting psychiatric medications. He had previously reported electronically for three years (2021-2023). He was now handed an unfamiliar, expanded paper form used only in the Northern District. At Week 7, with zero graduated sanctions attempted, the Probation Office filed a

petition and arranged for the Marshals Fugitive Task Force to arrest Morris at his residence—despite the Court having authorized only a summons.

Morris admitted Mandatory Condition 1 only. Three violations were discharged. The Court imposed 48 months: 12 months per count, consecutive. The Government had requested 56 months.

## II. ARGUMENT

### A. GROUND ONE: INEFFECTIVE ASSISTANCE OF COUNSEL

#### *1. Legal Standard*

The Sixth Amendment guarantees effective assistance of counsel at all critical stages of criminal proceedings, including revocation hearings. See Gagnon v. Scarpelli, 411 U.S. 778, 790 (1973); Mempa v. Rhay, 389 U.S. 128, 137 (1967). Under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must establish: (a) counsel's performance fell below an objective standard of reasonableness, and (b) there is a reasonable probability that, but for counsel's errors, the result would have been different. Id. at 687-94.

The Tenth Circuit applies this standard rigorously but recognizes that certain failures are so fundamental as to constitute deficient performance per se. See Hooks v. Ward, 184 F.3d 1206, 1219-20 (10th Cir. 1999) (failure to investigate obvious defenses); Byrd v. Workman, 645 F.3d 1159, 1168 (10th Cir. 2011) (failure to present available mitigating evidence); English v. Cody, 146 F.3d 1257, 1264 (10th Cir. 1998) (failure to raise meritorious issues). Where counsel's deficient advice induces a guilty plea or stipulation, the prejudice standard is met if the petitioner

demonstrates a reasonable probability he would not have stipulated but for the advice. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985); Lee v. United States, 582 U.S. 357, 365 (2017).

### *2. Hilfiger's Performance Was Deficient*

**The ex parte communication.** Hilfiger informed Morris during the 2023 revocation that Judge Eagan communicated it would be "in his best interest to stipulate." Any such communication—if it occurred—violated the Code of Conduct for United States Judges, Canon 3(A)(4), which provides that "[a] judge should not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties." See also 28 U.S.C. § 455(a) (disqualification where impartiality might reasonably be questioned); Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988) (ex parte contacts undermine judicial integrity). Hilfiger's duty was to object, not relay the communication as advice. See Padilla v. Kentucky, 559 U.S. 356, 371 (2010) (counsel has affirmative duty to provide accurate advice).

**Failure to challenge the § 1001 allegation.** Hilfiger stipulated to the most serious allegation—the § 1001 new law violation—without investigating or raising available defenses. The elements of § 1001(a)(1) are: (a) concealment of a material fact; (b) from a federal agency; (c) knowingly and willfully. See United States v. Yermian, 468 U.S. 63, 68-69 (1984). Each element was vulnerable:

*Willfulness was negated by Morris's handwritten notations* on the monthly report acknowledging additional accounts and his provision of bank statements showing the transactions at issue. A person engaged in willful concealment does not annotate government forms to flag the very information he is supposedly hiding. See United States v. Hicks, 948 F.3d

877, 881 (7th Cir. 2020) (distinguishing willful concealment from mere omission); United States v. Safavian, 528 F.3d 957, 965 (D.C. Cir. 2008) (willfulness requires awareness that conduct is unlawful).

*Materiality was doubtful* given the minimal balances in the undisclosed accounts: Alliant ($10/$15), UNIFY ($5), Langley ($6/$9), MetLife ($1,303). See United States v. Gaudin, 515 U.S. 506, 509 (1995) (materiality is an element the jury must find beyond a reasonable doubt). These dormant accounts with single-digit balances do not meet the threshold of statements capable of influencing the Probation Office's decisions.

*Criminal intent was undermined by psychiatric instability.* Morris was restarting medications for bipolar disorder during a 7-week period of cognitive vulnerability. Medical literature establishes that psychotropic medications require 8-12 weeks to achieve therapeutic levels. American Psychiatric Association, Practice Guidelines for the Treatment of Bipolar Disorder (3d ed. 2023). Untreated bipolar disorder impairs executive function, organizational capacity, and impulse control—the exact cognitive functions needed for accurate financial reporting. Hilfiger made no inquiry into Morris's psychiatric status.

**Failure to challenge invalid special conditions.** The special conditions—particularly the computer monitoring requirement (Special Condition 4) and the blanket financial surveillance regime (Special Condition 2)—are vulnerable to challenge under the 2023 and 2025 USSG amendments and Tenth Circuit precedent requiring individualized nexus. See United States v. Bear, 769 F.3d 1221, 1230 (10th Cir. 2014); United States v. Kellar, 963 F.3d 1070, 1077 (10th Cir. 2020). Hilfiger raised none of these challenges. A motion to vacate the invalid conditions would have eliminated the predicate for several of the alleged violations.

**Failure to present mitigating evidence.** Hilfiger failed to present: (a) Morris's 13-month bond compliance when properly medicated; (b) the 2023/2025 USSG amendments disfavoring incarceration for technical violations; (c) the Probation Office's failure to use graduated sanctions; (d) the electronic-to-paper reporting switch; and (e) the psychiatric medication defense. Each of these arguments was available from the record and required no additional investigation.

***3. Prejudice***

Under Strickland, prejudice exists where there is a reasonable probability that the outcome would have been different. 466 U.S. at 694. Under Glover v. United States, 531 U.S. 198, 203-04 (2001), any increase in prison time resulting from counsel's deficiency constitutes prejudice sufficient to support a § 2255 claim. The 8-month gap between the Government's 56-month request and the 48-month sentence demonstrates the Court's willingness to depart from the Government's recommendation. An effective advocate would have obtained concurrent rather than consecutive terms—a reduction from 48 months to 12-14 months. This exceeds the "reasonable probability" threshold by orders of magnitude.

## B. GROUND TWO: DUE PROCESS VIOLATIONS

### *1. Legal Standard for Revocation Proceedings*

The Due Process Clause requires that revocation proceedings satisfy minimum requirements of fundamental fairness. Morrissey v. Brewer, 408 U.S. 471, 481 (1972). These include: (a) written notice of claimed violations; (b) disclosure of evidence; (c) opportunity to be heard and present witnesses; (d) right to confront and cross-examine adverse witnesses; (e) a neutral decisionmaker; and (f) a written statement of reasons for any revocation. Id. at 489. Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973), extended these protections to supervised release. The requirement of a "neutral decisionmaker" extends to the probation officer's role, as the officer's petition initiates the proceedings and substantially shapes the Court's consideration.

### *2. The Probation Office Violated Its Statutory Duty of Neutrality*

18 U.S.C. § 3603 provides that a probation officer "shall use all suitable methods, not inconsistent with the conditions specified by the court, to aid a person on probation and bring about improvements in his conduct and condition." (emphasis added). The verb "aid" is not aspirational—it is mandatory. The statute establishes probation officers as rehabilitative supervisors, not prosecutors or criminal investigators.

The Administrative Office's Guide to Judiciary Policy, Volume 8E, §§ 310-410 (2024), implements this statutory mandate through specific operational requirements. Section 310 establishes the supervision framework as oriented toward "successful completion of the term." Section 360.10 requires professional neutrality. Section 360.20 mandates graduated sanctions before revocation. Section 400 requires consideration of mental health factors. Section 410 directs collaborative compliance planning.

Officer McClintock's conduct violated each of these provisions. Within days of Morris's first monthly report—his first interaction with the Office after a three-year gap—the Office launched an adversarial investigation that included: soliciting complaints from Morris's neighborhood association about a $30 PayPal payment for neighborhood dues; conducting a full residential search; searching Cash App for Morris's name like a criminal investigator; seizing four boxes of financial documents; requesting an arrest warrant when only a summons was authorized; and deploying the Marshals Fugitive Task Force for a nonviolent, compliant supervisee.

This conduct satisfies the Seventh Circuit's standard for actionable government animus. See Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir. 1995) (Posner, J.) (government targeting an individual without legitimate basis violates due process). It also satisfies the "class of one" equal protection standard. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (intentionally different treatment of one individual from similarly situated persons, without rational basis, violates equal protection).

### *3. The Unauthorized Expanded Monthly Report*

The Northern District of Oklahoma uses a locally-modified monthly supervision report that substantially exceeds the standard AO Form OPROB 8 used in other federal districts. The standard OPROB 8 contains approximately 35-40 basic data points. The Northern District form adds expanded financial disclosure requirements including payment apps, electronic wallets, BNPL services, pre-paid cards, and detailed historical account information. No other Oklahoma federal district—Eastern or Western—uses this expanded form. Both use the standard OPROB 8 or Electronic Reporting System (ERS).

Morris reported electronically during 2021, 2022, and 2023 using the ERS, which employs a simplified questionnaire of approximately 15-20 questions. In 2025, he was handed—without explanation or instruction—an unfamiliar paper form with dramatically expanded requirements. This switch imposed new conditions of supervision without judicial authorization, in violation of 18 U.S.C. § 3583(e)(2) (only the Court may modify conditions) and the Tenth Circuit's holdings in United States v. Cabral, 926 F.3d 687, 692 (10th Cir. 2019), and United States v. Mike, 632 F.3d 686, 692 (10th Cir. 2011) (probation officers may not unilaterally impose conditions).

The disparate treatment between districts creates a due process and equal protection problem. A supervisee in the Northern District faces revocation for not listing a PayPal account, while a supervisee in the Eastern District would never be asked. This is not a minor procedural variation—it is the difference between liberty and a 48-month prison sentence. See Bush v. Gore, 531 U.S. 98, 104-05 (2000) (per curiam) (disparate application of standards violates equal protection).

***4. Zero Graduated Sanctions***

The 2023 and 2025 USSG amendments to Chapter 7 establish graduated sanctions as the presumptive response to Grade C technical violations. U.S.S.G. § 7B1.3 (2025); Ch. 7, Pt. A (Policy Statement) (2025). The AO Guide, Vol. 8E, § 360.20, requires exhaustion of "all reasonable efforts to promote compliance" before revocation. AO Policy Memorandum 23-07 (2023) mandates collaborative compliance planning and non-custodial interventions for technical violations.

Available graduated sanctions included but were not limited to: verbal warning; written warning; increased reporting frequency; modified reporting form; community service; brief detention; treatment referral; mental health evaluation; and condition modification under § 3583(e)(2). The Probation Office employed none of these. It proceeded from Morris's first monthly report directly to a revocation petition.

The failure to employ graduated sanctions is not merely a policy violation—it is a due process violation because it deprives the supervisee of the procedural protections that federal law affords. See Black v. Romano, 471 U.S. 606, 611-12 (1985) (due process requires that revocation proceedings be fundamentally fair). The Government's celebration of speed (Document 96 at 3: "quick and thorough diligence") confirms the punitive orientation.

***5. The Fugitive Task Force Arrest***

The Court's order authorized a summons. Document 84 at 5. The Probation Office instead arranged for the Marshals Fugitive Task Force to arrest Morris at his residence. Under Federal Rule of Criminal Procedure 32.1(a)(1), a summons is an appropriate alternative to arrest for supervisees who do not pose a danger or flight risk. Morris had no history of violence, no weapons, no flight history. He self-surrendered in 2016 and complied with 13 months of pretrial bond.

The deployment of a fugitive task force—designed and equipped for armed, dangerous fugitives—to arrest a 64-year-old nonviolent technical violator is per se evidence of punitive intent. It cannot be justified by any legitimate supervisory purpose. See United States v. Melendez-Santana, 353 F.3d 93, 102 (1st Cir. 2003) (condemning disproportionate tactics). The

trauma of a tactical arrest predictably exacerbated Morris's PTSD and destabilized his psychiatric condition—exactly the opposite of the "aid" that § 3603 mandates.

## C. GROUND THREE: VIOLATION OF ESTERAS v. UNITED STATES

### *1. The Esteras Framework*

In Esteras v. United States, 606 U.S. ___ (2025), the Supreme Court held that when imposing a revocation sentence under 18 U.S.C. § 3583(e)(3), courts may not rely on the punitive purposes enumerated in § 3553(a)(2)(A): (i) reflecting the seriousness of the offense; (ii) promoting respect for the law; and (iii) providing just punishment. Id. at ___ (slip op. at 8-12).

The Court's reasoning was straightforward: revocation sanctions address a different purpose than the original sentence. The original sentence punishes the offense. Revocation addresses the breach of the court's trust during supervision. The only permissible revocation considerations are: (a) deterring future violations of supervision conditions; (b) protecting the public from further violations during the supervision term; and (c) providing the defendant with correctional treatment. Id. at ___ (slip op. at 10-11). See also Johnson v. United States, 544 U.S. 295, 303 (2005) (revocation sanctions breach of trust, not original offense).

### *2. The Government's Memorandum Is a Catalogue of Esteras Violations*

AUSA Whipple's Sentencing Memorandum (Document 96) contains at least five distinct Esteras violations:

**First:** Invocation of original offense severity. "The Court would be hard-pressed to find a similarly situated defendant who has demonstrated a more recidivistic pattern and lifestyle of fraudulent behavior." (Document 96 at 1-2.) This characterization addresses the nature and seriousness of the underlying bank fraud—a punitive consideration Esteras prohibits.

**Second:** Demand for maximum punishment. "Mr. Morris's criminal history and characteristics warrant the stiffest permissible sentence under the law." (Document 96 at 2.) The phrase "stiffest permissible sentence" is a demand for retribution—the paradigmatic § 3553(a)(2)(A) consideration that Esteras forbids.

**Third:** Character assassination. "His conniving, manipulative and narcissistic behaviors continue unabated, an obvious risk to public safety." (Document 96 at 3, quoting 02-CR-072-JHP, Dkt. 151, p. 17.) This decades-old characterization from an unrelated case is designed to re-punish Morris for who he is, not for the supervision violation.

**Fourth:** Framing incarceration as the sole remedy. "Freedom has only enabled and motivated Mr. Morris to commit additional criminal conduct." (Document 96 at 2.) Under Esteras, this language treats liberty itself as the problem—the opposite of the rehabilitative purpose that Esteras holds is the only permissible focus.

**Fifth:** Reliance on criminal history to justify severity. The memorandum devotes three of its five pages to Morris's "previous five federal fraud-related convictions since 1988" and "seven prior revocations." (Document 96 at 2.) This historical narrative is designed to re-sentence the original offenses through the revocation vehicle—precisely what Esteras forbids.

### *3. The Consecutive Sentence Structure Confirms Punitive Intent*

Morris admitted one violation: Mandatory Condition 1. Three violations were discharged. Yet the Court imposed 12 months on each of four counts, consecutively, totaling 48 months. Under 18 U.S.C. § 3584, the decision to impose consecutive sentences must be justified under the § 3553(a) factors and the court must state its reasons. United States v. Rose, 185 F.3d 1108, 1111-13 (10th Cir. 1999).

Stacking consecutive terms across four underlying counts for a single admitted supervision violation—especially when the three more specific violations were discharged—is not correction. It is punishment for the original bank fraud offense, imposed under the guise of revocation. This is the core practice Esteras condemns.

### *4. Retroactive Application*

Esteras establishes a substantive rule about what factors courts may lawfully consider. Substantive rules apply retroactively on collateral review because they alter the range of permissible punishment. Welch v. United States, 578 U.S. 120, 129 (2016); Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004). Before Esteras, the Government's memorandum was standard advocacy. After Esteras, it is impermissible in its entirety. The sentence was built on a legal foundation that has since collapsed. It must be vacated.

## D. GROUND FOUR: THE 2023/2025 USSG AMENDMENTS AND INVALID SPECIAL CONDITIONS

### *1. The Graduated Sanctions Framework*

Amendment 821 (effective Nov. 1, 2023) and the 2025 amendments to Chapter 7 fundamentally restructured revocation sentencing. The Commission determined—based on extensive empirical data—that incarceration for technical violations is counterproductive: it increases recidivism, imposes costs disproportionate to any public safety benefit, and diverts BOP resources from more dangerous populations. See USSC, Report to Congress: 2025 Amendments to Chapter 7 (2025).

Under the current framework, revocation to custody for Grade C violations (technical noncompliance) is appropriate only when: (a) graduated sanctions have been attempted and failed; (b) the defendant poses a danger to persons or property; or (c) the defendant's violation pattern demonstrates unwillingness to comply that non-incarcerative sanctions cannot address. U.S.S.G. § 7B1.3 (2025); Ch. 7, Pt. A (2025). None of these conditions were met. No graduated sanctions were attempted. Morris posed no danger. His "pattern" was one monthly report during a period of psychiatric instability.

### *2. The Special Conditions Are Invalid Under § 5D1.3(b) (2025)*

The 2025 amendments to § 5D1.3(b) impose heightened requirements on special conditions. Each condition must: (1) be reasonably related to the offense, the defendant's history, and the statutory sentencing factors; (2) involve no greater deprivation of liberty than reasonably necessary; (3) be consistent with Sentencing Commission policy; and (4) reflect individualized assessment. See also 18 U.S.C. § 3583(d)(1)-(2) (same requirements by statute).

**The computer monitoring condition (Special Condition 4) has zero offense nexus.** Morris's offenses—check kiting and false loan applications—were paper-based, in-person transactions with no computer component. The factual basis of the plea (Document 44, ¶ 13) describes physical checks, face-to-face bank visits, and paper loan applications. Not a single paragraph references a computer, the internet, email, or any electronic communication. Imposing comprehensive computer surveillance—including password disclosure, remote monitoring software, encryption prohibition, and mandatory telephone records—on a defendant whose offense had no digital component fails the individualized nexus requirement. See United States v. Crume, 422 F.3d 728, 733 (8th Cir. 2005) (vacating internet restriction where offense unrelated to internet); United States v. Voelker, 489 F.3d 139, 145-46 (3d Cir. 2007) (same); United States v. Mike, 632 F.3d 686, 696 (10th Cir. 2011) (conditions must bear reasonable relation to offense).

**The financial conditions (Special Condition 2(a)-(e)) are overbroad boilerplate.** While financial monitoring conditions may be appropriate for fraud defendants, the breadth of these conditions—prohibiting *any* credit arrangement, requiring disclosure of *all* assets and liabilities, prohibiting *any* transfer without approval—exceeds what is reasonably necessary for a defendant who has served over ten years in federal custody. See United States v. Kellar, 963 F.3d 1070, 1077 (10th Cir. 2020) (conditions must be "no greater than necessary"); United States v. Bear, 769 F.3d 1221, 1230 (10th Cir. 2014) (requiring "reasonable relation"). The Commission's proposed 2026 amendments specifically target such "catalog" conditions, requiring oral findings justifying each condition individually.

**A defendant cannot be lawfully revoked for violating conditions that are themselves unlawful.** If the special conditions exceed the Court's authority under § 3583(d), the current

Guidelines, and Tenth Circuit precedent, then any revocation premised on those conditions is void ab initio. See Cabral, 926 F.3d at 692.

## E. GROUND FIVE: GOVERNMENT MISCONDUCT AND INSTITUTIONAL ANIMUS

### *1. The § 1001 Threat Violated DOJ Policy and Was Coercive*

The DOJ Manual, § 9-42.160, establishes criteria for § 1001 prosecutions. The Manual requires that: (a) the false statement be material; (b) the statement be knowingly and willfully false; (c) the case involve significant economic harm or substantial threat to public safety; and (d) prosecution be approved by the responsible U.S. Attorney or designated supervisor. The Manual specifically cautions against § 1001 prosecution for omissions on government forms where the circumstances suggest negligence or confusion rather than intentional fraud.

None of the DOJ Manual criteria were met. There was no significant economic harm. There was no threat to public safety. The omissions were on a government supervision form during a period of psychiatric instability. The Government used the § 1001 threat not because prosecution was warranted but because the threat was useful leverage to coerce Morris's stipulation. See Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978) (recognizing that prosecutorial charging power has limits); Brady v. United States, 397 U.S. 742, 750 (1970) (guilty plea must be voluntary).

### *2. Systematic Mischaracterization of Technical Violations*

The Government's sentencing memorandum treats all prior revocations as evidence of "fraudulent behavior" (Document 96 at 2) without distinguishing between revocations based on new criminal conduct and those based on technical supervision violations. The 2023 revocation

was based entirely on financial reporting omissions—every account legal, every payment current, 782 credit score. The deliberate conflation of technical noncompliance with criminal fraud is a factual misrepresentation to the Court that infected the sentencing calculus.

### *3. The Pattern of Institutional Animus*

The totality of the Government's conduct reveals institutional animus: zero graduated sanctions across two revocation proceedings; a fugitive task force arrest of a nonviolent, compliant supervisee; a § 1001 threat for an incomplete monthly report; solicitation of neighborhood complaints about a $30 PayPal payment; celebration of speed in seeking revocation; and decades-old character assassination from unrelated proceedings. This is not impartial justice. This is a pattern of conduct designed to ensure Morris's permanent incarceration regardless of his actual compliance behavior or mental health needs.

## F. GROUND SIX: RESTITUTION AS COMPOUND PUNISHMENT UNDER ELLINGBURG

In Ellingburg v. United States, 604 U.S. ___ (2026), the Supreme Court held unanimously that restitution under the Mandatory Victims Restitution Act constitutes criminal punishment. Justice Thomas's concurrence extended this to all coercive sovereign penalties. This holding transforms the analysis of Morris's $1,640,530.71 restitution obligation.

Under Ellingburg, the restitution obligation must be considered as part of the total punishment when evaluating the revocation sentence. The cumulative punishment Morris faces for a bank fraud conviction is: 78 months (original sentence) + 36 months (first revocation) + 48 months (current revocation) + $1,640,530.71 (restitution as punishment) = 162 months of incarceration plus $1.64 million in criminal penalties. For a nonviolent bank fraud with a stipulated loss of approximately $1.96 million, this cumulative punishment raises serious proportionality concerns under the Eighth Amendment. See Solem v. Helm, 463 U.S. 277, 290 (1983) (proportionality review required for non-capital sentences).

Moreover, continued incarceration defeats the restitution's stated purpose. Morris cannot earn income to satisfy the obligation while imprisoned. The victims receive nothing. Each additional day of incarceration compounds the punishment while preventing the remedy. Under Ellingburg, this Court must weigh the restitution burden against additional incarceration. The failure to do so at sentencing—before Ellingburg clarified the law—constitutes an additional basis for resentencing.

### III. THE § 3553(A) FACTORS INDEPENDENTLY REQUIRE RELIEF

Even if this Court declines to vacate on any individual ground, the § 3553(a) factors independently demonstrate that the 48-month consecutive sentence is substantively unreasonable.

**Nature and circumstances (§ 3553(a)(1)):** The revocation violation was a reporting omission on a monthly form—not a new crime, not fraud, not violence. BOP's minimum-security designation confirms minimal risk.

**History and characteristics (§ 3553(a)(1)):** Morris is 64 with bipolar disorder, impulse-control disorder, PTSD, and major depressive disorder (confirmed by Mayo Clinic, Dr. Richter, Dr. Wakefield). When medicated: 13 months flawless bond compliance. When unmedicated: violations. The causal link is medical, not moral.

**Deterrence (§ 3553(a)(2)(B)):** Empirical evidence confirms that incarceration for technical violations increases recidivism. Council of State Governments Justice Center, Confined and Costly (2019). For nonviolent offenders over 60, recidivism is below 3%. USSC, Effects of Aging on Recidivism (2017). Incarceration does not deter Morris—proper psychiatric treatment does.

**Public protection (§ 3553(a)(2)(C)):** Morris poses no danger to any person or property. His underlying offense was nonviolent. His revocation violation was a paperwork omission. BOP designated him to minimum security.

**Correctional treatment (§ 3553(a)(2)(D)):** GAO-26-107268 documents a 71% BOP processing failure rate with BOP concurrence (admissions against interest under FRE

801(d)(2)(A)). GAO-26-107353 documents 21,190 unapplied credits, 38% RRCs at 95%+ capacity. BJS NCJ 310701 documents 22% medical vacancy, lost accreditation at 22/121 facilities. BOP cannot provide treatment § 3553(a)(2)(D) requires. See Trump v. J.G.G., 604 U.S. 670 (2025) (independent judicial review constitutionally required); 31 U.S.C. § 702 (GAO Congressional authority).

**Sentencing disparity (§ 3553(a)(6)):** A 48-month consecutive sentence for a single reporting violation on an elderly, mentally ill defendant after 7 weeks of supervision creates unwarranted disparity with similarly situated defendants. USSC data confirms median revocation sentences for Grade C violations are substantially lower.

**Restitution (§ 3553(a)(7)):** Under Ellingburg, the $1,640,530.71 restitution is punishment. Incarceration prevents payment. The victims are better served by supervised release conditions enabling restitution than by four years of imprisonment producing zero dollars.

## IV. CONCLUSION

This memorandum demonstrates, through verified legal authority, that Morris's 48-month consecutive revocation sentence is constitutionally and legally infirm on six independent grounds. The sentence was obtained through ineffective counsel, imposed in violation of due process and Esteras, built on invalid special conditions, procured through government misconduct, and compounded by restitution that Ellingburg now recognizes as criminal punishment.

This Court has the authority and the duty to correct this sentence. The law has changed. The framework under which Morris was sentenced no longer exists. Esteras prohibits the punitive reasoning that drove the Government's request. The 2023 and 2025 Guidelines amendments make graduated sanctions—not incarceration—the presumptive response. The special conditions lack individualized nexus under current law. And Ellingburg requires that the $1.64 million restitution burden be weighed against additional imprisonment.

Morris respectfully requests that this Court vacate the sentence, resentence under the current legal framework, and grant such further relief as justice requires.

Respectfully submitted,



Michael Chase Morris, Pro Se

Register No. 05990-062

FCI Forrest City Camp

P.O. Box 9000

Forrest City, AR 72336

Dated: March 23, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 23 day of March_, 2026, I served a true and correct copy of the foregoing Memorandum of Law upon the following by U.S. Mail, first-class postage prepaid:

Clinton J. Johnson, United States Attorney

David D. Whipple, Assistant United States Attorney

110 West Seventh Street, Suite 300

Tulsa, Oklahoma 74119

______________________________

Michael Chase Morris, Pro Se

March 23, 2026

VIA U.S. MAIL

Clerk of Court

United States District Court

Northern District of Oklahoma

333 West Fourth Street, Room 411

Tulsa, Oklahoma 74103-3819

**Re:** United States v. Michael Chase Morris

Case No. 15-CR-0115-001-CVE

Motion to Vacate Under 28 U.S.C. § 2255

Dear Clerk of Court:

Enclosed for filing in the above-captioned case, please find the following documents:

**1.** Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (with exhibits);

**2.** Memorandum of Law in Support of Motion to Vacate Under 28 U.S.C. § 2255.

**Filing Date — Prison Mailbox Rule.** Petitioner respectfully requests that the Clerk docket these documents with a filing date of **March 23, 2026**, the date on which they were delivered to prison authorities for mailing, pursuant to the prison mailbox rule established in *Houston v. Lack*, 487 U.S. 266, 276 (1988), and codified at 28 U.S.C. § 2255(f) and Rule 3(d) of the Rules Governing Section 2255 Proceedings. *See also Price v. Philpot*, 420 F.3d 1158, 1163-64 (10th Cir. 2005) (applying prison mailbox rule to § 2255 motions).

**Service on the Government via ECF.** Petitioner respectfully requests that the Clerk serve the United States Attorney's Office for the Northern District of Oklahoma via the Court's Electronic Case Filing ("ECF") system, pursuant to the Local Rules of the Northern District of Oklahoma, LCvR 5.1 and LCrR 49.1, and the Court's CM/ECF Administrative Procedures. The Assistant United States Attorney assigned to this case is:

David D. Whipple

Assistant United States Attorney

110 West Seventh Street, Suite 300

Tulsa, Oklahoma 74119

ECF Registrant

In addition to ECF notification, Petitioner is separately mailing a copy of all enclosed documents to AUSA Whipple at the above address.

**Return of File-Stamped Copies.** Pursuant to the Judicial Conference of the United States' policy directives regarding access to court records for incarcerated pro se litigants, and consistent with the Court's obligations under the Prison Litigation Reform Act and general pro se access principles, Petitioner respectfully requests that the Clerk return one file-stamped copy of each document to Petitioner at the address below. *See* Judicial Conference Policy on Privacy and Public Access to Electronic Case Files (2008); AO Guide to Judiciary Policy, Vol. 12, § 510 (access to records for parties).

Petitioner's current mailing address is:

Michael Chase Morris

Register No. 05990-062

FCI Forrest City Camp

P.O. Box 9000

Forrest City, AR 72336

Thank you for your assistance in processing this filing.

Respectfully submitted,

Michael Chase Morris, Pro Se

Register No. 05990-062

**Enclosures:**

1. Motion to Vacate Under 28 U.S.C. § 2255
2. Memorandum of Law in Support

**cc:** David D. Whipple, AUSA (via U.S. Mail)

Postmarked 3/27/2026
15cr115-CVE-1 8

PRESS FIRMLY TO SEAL

PRESS FIRMLY T

UNITED STATES POSTAL SERVICE®

PRIORIT MAIL

MS

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international des
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverag

FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

To schedule free Packa
scan the QR co

USPS.COM/PICK

how2recycle.info PAPER POUCH

P

US POSTAGE PAID IMI
2026-03-27
72336
C4703148
Commercial
FLAT RATE ENV

easypost

0901000018435

USPS PRIORITY MAIL

MICHAEL CHASE MORRIS REG. 05990-062
FCI FORREST CITY CAMP
PO BOX 7000
FORREST CITY AR 72336-7000

0003

C007

SHIP TO: CLERK OF THE COURT
UNITED STATES DISTRICT COURT NORTHERN
OK
333 W 4TH ST STE 411
TULSA OK 74103-3819

RECEIVED
MAR 3 0 2026
Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

USPS TRACKING #

9405 5361 0619 6288 8062 27

PirateShip®.com
Make shipping fun

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.